1      UNITED STATES DISTRICT COURT
           MIDDLE DISTRICT OF TENNESSEE
2               NASHVILLE DIVISION

3


4    UNITED STATES OF AMERICA        )
                                     )
5    VS                              )   No. 3:16-00162
                                     )
6    JAMES C. MCWHORTER              )
     _____

7

8


9     BEFORE THE HONORABLE ALETA A. TRAUGER, DISTRICT JUDGE

10               TRANSCRIPT OF PROCEEDINGS

11                 December 16, 2016

12    _____

13    **APPEARANCES:**

14    For the Government:      S. CARRAN DAUGHTERY
                               Asst. U.S. Attorney
15                             110 Ninth Ave S., Suite A961
                               Nashville, TN 37203
16

17    For the Defendant:       MICHAEL C. HOLLEY, ESQ.
                               Federal Public Defender's
18                                Office
                               810 Broadway, Suite 200
19                             Nashville, TN 37203

20

21

22    _____

      **Roxann Harkins, RPR, CRR**
23    Official Court Reporter
      801 Broadway, Suite A837
24    Nashville, TN 37203
      615.403.8314
25    roxann_harkins@tnmd.uscourts.gov

# I N D E X

<u>Government witness</u>

**ADRIAN ROMANIUK**

Direct Examination By Ms. Daughtrey .................5
Cross-Examination By Mr. Holley .....................7


<u>Defense witness</u>

**O'BRIAN CARTER**

Direct Examination By Mr. Holley ....................8
Cross-Examination By Ms. Daughtrey .................11

# E X H I B I T S

Government No. 1....Police reports from IN .........4


Defense No. 1....Memo received in discovery by ....12
        defense

1

2

3          The above-styled cause came to be heard

4   on December 16, 2016, before the Hon. Aleta A.

5   Trauger, District Judge, when the following

6   proceedings were had at 3:33 p.m. to-wit:

7

8          THE COURT:  Good afternoon.  We're here

9   on sentencing in the United States versus James C.

10  McWhorter.  We have Carrie Daughtrey for the

11  government and Michael Holley for Mr. McWhorter.

12          Mr. McWhorter, have you read the

13  presentence report?

14          THE DEFENDANT:  Yes, Your Honor, I have.

15          THE COURT:  Feel you understand it?

16          THE DEFENDANT:  Absolutely, yes,

17  Your Honor.

18          THE COURT:  Looks as though there are no

19  issues on the contents of the presentence report or on

20  the guideline calculations, so I'm going to accept the

21  presentence report as my findings of fact on all

22  issues and on the application of the guidelines.

23          The offense level is a 7, the criminal

24  history category is V.  The resulting guideline range

25  is 12 to 18 months with one to three years of

1    supervised release.

2              The defendant is requesting a five-year

3    probationary sentence with the first 12 months to be

4    in the halfway house and 240 hours of community

5    service working for a prison publication.  The

6    defendant -- the government is seeking 14 months of

7    custody.

8              Are there any witnesses today?

9              MS. DAUGHTREY:  Your Honor, the only

10   witness I have is Adrian Romaniuk -- I just spaced on

11   that -- to testify very briefly.  In advance of that,

12   I would like to submit as Government Exhibit 1 the

13   police reports from Indiana regarding the --

14             THE COURT:  Okay.

15             MS. DAUGHTREY:  Police reports and other

16   documents regarding the --

17             THE COURT:  Does the defense have those?

18             MS. DAUGHTREY:  Yes.

19             MR. HOLLEY:  Your Honor, I received it a

20   minute ago.

21             THE COURT:  Okay.  All right.  We'll make

22   this Government Exhibit 1.  Let me have a moment to

23   look at this.

24             (Government Exhibit No. 1 was admitted.)

25             MR. HOLLEY:  Your Honor, I noticed that

1  Mr. McWhorter's Social Security number is on this.  I

2  don't know if these were filed, if these are

3  accessible to the public or not.  I'm not sure if the

4  same rules --

5           THE COURT:  No, the exhibits are not

6  accessible to the public, but thank you.

7           (Pause in proceedings.)

8           THE COURT:  Okay.  We'll make this

9  Government Exhibit 1.

10          MS. DAUGHTREY:  I would call Detective

11  Adrian Romaniuk.

12          THE COURT:  All right.

13                **ADRIAN ROMANIUK**

14  called as a witness, after having been first duly

15  sworn, testified as follows:

16                **DIRECT EXAMINATION**

17  BY MS. DAUGHTREY:

18      Q.    Could you state your name for the record

19  and tell us where you're employed.

20      A.    My name is Adrian Romaniuk, and I am a

21  Deputy US Marshal with the United States Marshal

22  Service here in the Middle District of Tennessee.

23      Q.    And is this your case, this James C.

24  McWhorter case?

25      A.    I have not been assigned this case, but I

1  have been briefed on the information regarding this

2  case.

3       Q.    And who is the lead deputy on this case?

4       A.    The lead investigator is Christopher

5  Burt, another deputy here in the same district.

6       Q.    He's not available to be here today --

7       A.    That's correct.

8       Q.    -- because of some law enforcement work

9  he's doing; is that correct?

10       A.    Correct.

11       Q.    And he told you some information about

12  the case in preparation for today; is that correct?

13       A.    That's correct.

14       Q.    All right.  And as a result of what he

15  told you, did you call CheckSmart up in Indiana and

16  speak with them?

17       A.    I did.  One correction.  The CheckSmart

18  corporate headquarters that I called is in Ohio.  And

19  I did speak with them yesterday and as well this

20  morning.

21       Q.    Okay.  And were you able to determine

22  whether or not they ever got the money that was given

23  to Mr. McWhorter back on November 25 of last year, the

24  $1,459.96?

25       A.    I did speak with them.  I spoke with a

Dan Perry of the corporate security and fraud
department within CheckSmart. He advised me that
there is still a balance pending of $1,479.96, which
is the amount you mentioned, plus a $20 returned check
fee.

      Q.    Okay.

      MS. DAUGHTREY:  Thank you very much.

      THE COURT:  Any cross?

**CROSS-EXAMINATION**

BY MR. HOLLEY:

      Q.    Is it correct, I gather, from these
reports and what you said that this check was returned
for insufficient funds?

      A.    I don't know why it was returned.  I was
told that the -- there is an amount pending on a
returned check.  I don't know the specifics.

      Q.    So it's entirely possible it was returned
for insufficient funds?

      A.    I don't know.

      Q.    That's possible; right?

      A.    Anything's possible.

      Q.    You don't know why it was not honored;
right?

      A.    I don't know why it was returned.  I just
have a returned check fee.

1          MR. HOLLEY:  Okay.  That's all.

2          THE COURT:  You may step down.

3           *****WITNESS EXCUSED*****

4          THE COURT:  Any other witnesses from the

5     government?

6          MS. DAUGHTREY:  No, Your Honor.

7          THE COURT:  Any witnesses from the

8     defense?

9          MR. HOLLEY:  Your Honor, I would like

10    to -- I'd like to call Mr. Carter.

11         THE COURT:  Okay.

12         MR. HOLLEY:  O'Brian Carter.

13         THE COURT:  Okay.

14                    **O'BRIAN CARTER**

15    called as a witness, after having been first duly

16    sworn, testified as follows:

17                   **DIRECT EXAMINATION**

18    BY MR. HOLLEY:

19         Q.    Mr. Carter, what is your job?

20         A.    Investigator.

21         THE COURT:  Can we have a full name,

22    please?

23         MR. HOLLEY:  Oh, I'm sorry.

24         THE WITNESS:  Torrado O'Brian Carter.

25    T-o-r-r-a-d-o, O'Brian, O apostrophe B-r-i-a-n, last

1   name Carter, C-a-r-t-e-r.

2   BY MR. HOLLEY:

3          Q.    And Mr. Carter, you're an investigator

4   with the Federal Public Defender?

5          A.    That is correct.

6          Q.    And were you assigned to work on

7   Mr. McWhorter's case?

8          A.    Yes, sir.

9          Q.    Now, at some point in September did I ask

10  you to talk to an attorney named Jeffery "Chip"

11  Frensley?

12         A.    Yes, sir.

13         Q.    And what was that about?

14         A.    Picking up Mr. McWhorter's property.

15         Q.    What property was that?

16         A.    Some computer equipment.

17         Q.    And what type of computer equipment was

18  that?

19         A.    From my understanding it was the computer

20  equipment that Mr. McWhorter used to make fake

21  identifications.

22         Q.    And he used that equipment years ago in

23  his old federal case; right?

24         A.    That's my understanding.

25         Q.    And Mr. Frensley was his attorney in the

1   old federal case?

2         A.    Yes, sir.

3         Q.    And did Mr. Frensley explain to you how

4   he came into possession of it?

5         A.    Yes, sir.

6         Q.    How was that?

7         A.    At the end of the case the property was

8   given to him, I believe, by agents.  And he held the

9   property there with him in his office.

10        Q.    Okay.  And at least one of these was an

11  expensive printer for printing fake -- for printing

12  IDs; right?

13        A.    That's correct.

14        Q.    And did Mr. Frensley tell you if he

15  offered to -- told Mr. McWhorter he could come and

16  pick it up or what he tried to do with it?

17        A.    Yes, sir.

18        Q.    What did Mr. Frensley say about that?

19        A.    He offered several attempts for

20  Mr. McWhorter to come and pick up his property.

21        Q.    And did Mr. McWhorter ever come and get

22  it?

23        A.    No, sir.

24        Q.    And where is that property now?

25        A.    It's in our office at 810 Broadway,

1    Suite 200.

2        Q.    Did Mr. McWhorter give us permission just

3    to destroy it?

4        A.    Yes, sir.

5        MR. HOLLEY:  That's all.

6        THE COURT:  Okay.  Any cross?

7                  **CROSS-EXAMINATION**

8    BY MS. DAUGHTREY:

9        Q.    That's a 10-year-old printer; is that

10   correct?

11       A.    I'm not sure of the age of the printer.

12       Q.    But it was from the time that he was

13   committing the fraud that he was prosecuted for in the

14   federal case; correct?

15       A.    That's my understanding, yes.

16       MS. DAUGHTREY:  That's all I have.

17       THE COURT:  Anything else?

18       MR. HOLLEY:  No questions, Your Honor.

19       THE COURT:  You can step down.  Thank

20   you.

21           *****WITNESS EXCUSED*****

22       THE COURT:  Any other witnesses?

23       MR. HOLLEY:  No witnesses.

24       THE COURT:  Okay.  I'll hear any further

25   argument.  I'll let the defense go first.  And also,

1    Mr. McWhorter, you have an opportunity to address the
2    Court and tell me anything you want me to hear before
3    I sentence you.
4                    MR. HOLLEY:  Your Honor, I also have one
5    exhibit and one other...
6                    THE COURT:  Okay.
7                    MR. HOLLEY:  This exhibit, Your Honor, is
8    a memo from -- that I received in the discovery.  You
9    can see by the date stamp.  And I guess I'll just
10   explain why I'm submitting it now.  Do you want to
11   read through it first?
12                   THE COURT:  Yeah, let me read it.
13                   MR. HOLLEY:  Okay.
14                   (Pause in proceedings.)
15                   (Defense Exhibit No. 1 was admitted.)
16                   THE COURT:  Okay, go ahead.
17                   MR. HOLLEY:  Your Honor, there's been
18   some suggestion in the government's sentencing
19   memorandum that the Strategic 1 Company didn't exist
20   in any sense.  Basically the last paragraph of this
21   memo shows that the marshal, Chris Burt, went to the
22   building on Church Street and he talked to a
23   receptionist who did know Mr. McWhorter worked there,
24   had worked there.  She hadn't seen him for about four
25   weeks and that she had seen other people who worked

1    for Strategic 1 there more recently.

2             I think that helps -- it's kind of a

3    small thing, Your Honor, but I think it helps

4    substantiate that this business was not just -- it was

5    not a fraud.  It was set up by Mr. McWhorter's friends

6    so he could operate as an independent contractor

7    doing, like, paralegal-type of work.

8             THE COURT:  Set up by his friends.

9             MR. HOLLEY:  Yes, Your Honor.  I mean,

10   that's where he would go to work.  The letter from

11   Tennyson and Wiggington refers to work that he did for

12   them previously.

13            THE COURT:  Is this a collection

14   business?

15            MR. HOLLEY:  Oh, no, Your Honor.

16            THE COURT:  What did he do for them?

17            MR. HOLLEY:  He -- they handled criminal

18   kind of cases, criminal, civil.  I think they do all

19   sorts of things, Your Honor, but he mainly helped

20   with -- I guess he mentioned a malpractice lawsuit,

21   but he knows a lot about criminal law.  He did a lot

22   of work as a jailhouse lawyer.  And really, his

23   knowledge is really expansive.

24            THE COURT:  What did he do for this

25   Strategic company?

1          MR. HOLLEY:  For Strategic, Strategic

2   would receive -- my understanding of it is, Strategic

3   would receive -- the halfway house wouldn't let him

4   just work as an independent contractor, so he had to

5   identify his employer.

6          So they set up Strategic to be his

7   employer, and then when he did work for people, they

8   could pay him through Strategic.  So Strategic

9   existed, they had an office space.  They had a bank

10  account.

11          This -- unfortunately, this last check he

12  cashed, there was insufficient funds by the time he

13  cashed it, but it was his method of -- of being able

14  to do good work, work that would lead to a career.

15          THE COURT:  You mean Tennyson and

16  Wiggington paid him through this Strategic shell?

17          MR. HOLLEY:  I believe whoever he worked

18  for, I know he did some work for Tennyson and

19  Wiggington.

20          THE DEFENDANT:  Chip Frensley.

21          MR. HOLLEY:  I believe he did some work

22  for Mr. Frensley as well.  I --

23          THE COURT:  Like what kind of work?

24          MR. HOLLEY:  Paralegal work, legal

25  research, writing.

1      THE DEFENDANT:  Writing memorandums, I

2 assisted a tremendous amount in a medical malpractice

3 case that Tennyson and Wiggington were working on.

4      THE COURT:  I didn't hear that.

5      MR. HOLLEY:  He had mentioned to me

6 before a medical malpractice case.  He, I mean, does

7 legal research, he does writing, I'm sure the

8 malpractice case probably involved document review and

9 so forth like that.  He did paralegal type of work.

10 And he is, I believe, very capable.

11      I mean, I submit that just to show that

12 there was an office space, there was an office space

13 rented, and he paid for the office -- Strategic 1 paid

14 for the office space.  And there was another person

15 from the halfway house that worked through Strategic 1

16 as well.  And that's -- there was a mention of that

17 somewhere in these papers, I believe.

18      Now, I should address -- well, there was

19 one other request I wanted to make.  This other

20 exhibit I brought is a copy of the letter that was

21 submitted on Mr. McWhorter's behalf at his previous

22 sentencing.  And it's in the file.  I'd rather not

23 actually file it as an exhibit because I don't want

24 it -- it's filed under seal in the other case, but the

25 Court could take judicial notice of it.

```
 1                THE COURT:  That's fine.  I can just read
 2      it.  Has -- Ms. Daughtrey, I presume, has seen it?
 3                MS. DAUGHTREY:  No, I have not.
 4                THE COURT:  Okay.
 5                MR. HOLLEY:  Your Honor, it's the
 6      document that we asked permission to access.
 7                THE COURT:  Well, I think you asked to
 8      see the whole PSR, didn't you?
 9                MR. HOLLEY:  We asked to see this --
10      actually, I just asked to see the sentencing memo, and
11      then I believe Ms. Daughtrey asked to see the
12      government's sentencing memo.  This was attached to
13      it.  And the third paragraph shows the real danger
14      that he was running by testifying.
15                THE COURT:  All right.  Let me read this.
16                (Pause in proceedings.)
17                THE COURT:  Okay.  I'll give this back to
18      you.
19                MR. HOLLEY:  Okay, Your Honor.  I won't
20      repeat everything I said in my memo, of course.
21                THE COURT:  Thank you.  I have read it.
22                MR. HOLLEY:  Yes.  I know you've read it.
23      I think I will just mainly respond to what the
24      government filed last night, a few statements in
25      there.
```

1          THE COURT:  Yes.

2          MR. HOLLEY:  One, the government halfway

3   asked the Court to decide that he committed a crime in

4   Indiana.  Now, that --

5          THE COURT:  Well, I sort of have a report

6   that indicates he did commit a crime in Indiana.

7          MR. HOLLEY:  Yes, Your Honor.  The

8   charges were dropped.  And, you know, I was just

9   handed this minutes ago.  And I think reading the

10  narrative supplement you can see a lot of reasons why

11  the charges were dropped.  I mean, for one thing --

12         THE COURT:  Well, namely because he's

13  been taken into federal custody because he escaped

14  from federal custody.  That's probably why the charges

15  were dropped.  They're kind of minor in comparison to

16  what he faces here.

17         MR. HOLLEY:  It could have been,

18  Your Honor.  I'm sure that happens in some cases, but

19  the government hasn't proved that's what happened.

20  They easily could have called a prosecutor in Indiana

21  if they wanted to prove that's what happened.  It

22  didn't -- they haven't proved it and they should have

23  been objecting to this 35 days ago when the

24  presentence report came out.  Or at least they should

25  have brought it up in a memo a week ago.

```
 1                    THE COURT:  They claim he was arrested on
 2      a fraud charge.  You don't disagree with that, do you?
 3                    MR. HOLLEY:  No, I don't, Your Honor.
 4                    THE COURT:  Okay.
 5                    MR. HOLLEY:  And the police report, this
 6      narrative supplement itself, there's a lot of reasons,
 7      you can see why this -- they probably figured out that
 8      this was not a bogus check, it was not a fraudulent
 9      check.  It was an insufficient fund check written to
10      Mr. McWhorter with the halfway house address for his
11      address.  And --
12                    THE COURT:  That he attempted to pass
13      months after he left the halfway house.
14                    MR. HOLLEY:  Yes, Your Honor.  And by
15      that time apparently the account didn't have as much
16      money in it as it had when the check was issued.
17                    And, you know, the basis for the
18      prosecutor bringing the charge involves him talking to
19      the US Marshal Service and being told that
20      Mr. McWhorter had actually formed Strategic 1, which
21      is who wrote the check, before he was incarcerated.
22      This is -- and that cashing fraudulent checks on
23      behalf of this company was part of the crime spree
24      that landed him in federal prison.  I mean, they don't
25      know what they're talking about, Your Honor.
```

1          They're thinking that Strategic 1 was a

2     company that -- and he was writing bad checks for

3     Strategic 1, which got him the 10 years in federal

4     prison.  That's not what happened at all, as we know

5     from this presentence report, from his other federal

6     presentence report.

7          He was creating fake IDs and making up

8     checks and cashing them at grocery stores and things

9     like that.  The prosecutor -- the Indiana prosecutor

10    calls down to Tennessee and gets absolute

11    misinformation.

12         Someone tells him -- someone tells the

13    prosecutor that Strategic 1 was never a functioning

14    company and was nothing but a scam to aid in

15    Mr. McWhorter's escape, which is likewise absolute

16    nonsense.  It was a functioning company.  It was a way

17    for him to work while he was at the halfway house, do

18    some decent work while he's there.  And nothing but a

19    scam to aid his escape is just ridiculous, Your Honor.

20    He's --

21              THE COURT:  Okay.  Okay.

22              MR. HOLLEY:  He can walk away from the

23    halfway house whenever he wants.  So the prosecutor is

24    given bad information and when it comes time to face

25    the charge, when the charge comes to court, he drops

1    it.  Now, if we wanted to know why the prosecutor

2    dropped it, the federal prosecutor here should have

3    established that.

4              Now, there are other things in the -- in

5    the memo that are somewhat new.

6              THE COURT:  How about the fact that he

7    didn't seek treatment for his Hepatitis C during the

8    whole time he was at the halfway house?

9              MR. HOLLEY:  Yes, Your Honor.  He did

10   seek it.  And I'll proffer that information and I

11   guess Mr. McWhorter would tell you himself.  In my

12   memo itself it explains how he sought treatment as

13   soon as he was in the halfway house.  My memo explains

14   he's not eligible for Obamacare while he's in BOP

15   custody.  So he wasn't able to get it that way.

16             Now, it takes him some time to figure out

17   how to -- how to get the drugs on his own.  He had to

18   get tested, he had to find someone that would take

19   him.  He had to apply to Gilead Support Path.  I guess

20   Gilead is the producer of this $85,000 drug.  It's not

21   something that you can just do in an instant.

22             And it's not too surprising that he was

23   out of the halfway house starting in I guess it was

24   September in Baltimore until his friend was murdered,

25   and yes, I assume he wasn't seeking treatment then.

1    While he was in the halfway house he couldn't get it,

2    at least through insurance.  And then he starts trying

3    to get treatment and it takes a few months to set up.

4    And really, it's unfortunate that -- the timing of

5    everything, but the drugs were actually there and

6    waiting for him.  The Michiana Clinic confirms that

7    they had the drugs and they sent them back.

8             So, you know, there's absolutely no doubt

9    that he has Hepatitis C and that his viral load is

10    getting higher and higher and that he's been seeking

11    treatment from the BOP and the BOP is not going to pay

12    for this treatment.

13             The judge gave him a top of the guideline

14    sentence.  There's really no chance they're going to

15    give him that treatment.  And so the sooner --

16    Hepatitis C, from what I've learned from some of the

17    stuff I filed, it's something that's chronic and it

18    will be with him and it develops at different paces in

19    different people.

20             Each day it goes on, he gets worse and is

21    in danger of developing bad -- bad situation.  And the

22    Gilead Support Path is always in danger of being shut

23    down.  That's not something everyone can get into.

24             You know, the government faults him for

25    not paying his restitution, despite having access to

1    this trust.  He does not have access to the trust.  As

2    the presentence report says, it's a spend thrift

3    trust.  He's never believed that he could get access

4    to it.

5             When the attorney contacted him in prison

6    about it, he was told it was a spend thrift trust and

7    he can't have any of it for anything while he's under

8    a sentence.  So he can't have it.  He can't get it.

9             And earlier today he sat down with the

10   government for a debtor's review, I guess is what it

11   was called, and told them everything he knows about

12   it.  And they are going to get his paperwork from

13   Diersen.  They called over to Diersen.  They have a

14   package which probably has his paperwork in there.

15            He offered to let them look at his Core

16   Links emails, he's e-mailed with this lawyer a couple

17   times about it.  He was notified about a trust, and he

18   honestly told them about it.  And to have that turned

19   against him is -- is unfair.

20            He also told Ms. Phillips here today

21   about a couple of watches that he could get -- has a

22   claim to that -- I forget the name of the county.  The

23   county where he was arrested in the old federal case,

24   seized from him that may be worth a good amount of

25   money, maybe 15, $20,000.  And he won a court case

1   against them where they are supposed to give them

2   back.

3           And he's never got -- in talking with

4   him, he realized, well, I could help you get those

5   back or they could probably seize them back, because

6   he had to pay some kind of filing fee and jump through

7   hoops to try to get them beyond what he'd already

8   done.

9           So he's trying to turn over his funds.

10  He's happy to pay off that restitution, be happy if it

11  could come out of the trust, he does not care.  And

12  the trust came from his father.  His father died, they

13  were all estranged.  His father died while he was in

14  prison, his mother died, his brother died, so he is

15  the last one to receive any of these fundings.

16          Now, so, Your Honor, those are the main

17  things that I saw in the response that conflicted with

18  what we've been saying.  You know, really, it is

19  unfortunate that this happened to Mr. McWhorter.  He

20  only had one left -- one month left at the halfway

21  house.  He was doing very well.  It's absolutely

22  believable that something like this happened.  I mean,

23  why else would he run off like this?  He had a job, he

24  was doing fine.  And he only had to be there one more

25  month.  And it's very unfortunate that that threw a

1    giant wrench in his life.

2              He has tried to cooperate with the

3    detective from Baltimore.  And I'm guessing that what

4    happened is he told about how his friend was murdered

5    up there.  The detective from Baltimore contacted us.

6              I'm guessing the government called to

7    Baltimore to try and prove that Mr. McWhorter was

8    lying about his friend, Eugene Nesbitt, being murdered

9    up there.  I found Eugene Nesbitt on the Internet,

10   yeah, he was murdered on that date.  Anyone could find

11   that.

12             Yes, the detective came down here on a

13   day's notice -- or he wanted to come down here

14   immediately.  Interviewed Mr. McWhorter and he

15   confirmed, yes, Mr. McWhorter was with him just

16   apparently, I guess, minutes or a very short time

17   before Mr. Nesbitt was murdered and he gave him

18   confirming, valid information and some leads.

19             We didn't ask for anything.  We didn't do

20   anything to try and protect Mr. McWhorter from

21   anything on this.  He told him just flat out how it

22   was and how he was there.  And that shows a

23   continuation of his efforts to rehabilitate.  When he

24   turned against that man in prison who'd done the

25   double murder, that was an enormous betrayal of that

1    man in prison and a very dangerous one for

2    Mr. McWhorter.

3                 He has been on the side of trying to do

4    things properly.  He's learned to be a jailhouse

5    lawyer.  He has -- and then in this case he's happily

6    trying to cooperate.  As he is with the money.  He's

7    trying to help them get the money back too.  He's

8    happy to do those things.

9                 And nonetheless -- you know, so it's

10   unfortunate he was thrown off.  He has -- he is being

11   punished for it already.  Before this sentence is

12   imposed today even, Your Honor.  And I've explained

13   this in the memo.

14                He has lost roughly six months of RDAP

15   credit that he was getting.  His sentence had been

16   shortened up to that one month from then date, and

17   he's lost that now.  And it's reflected in his BOP

18   records.

19                And Michelle Fulgram from the BOP

20   confirmed for me that that's clearly what happened.

21   He used to be classified as an RDAP releasee.  Now

22   he's classified as a good-time credit releasee.

23                As I've already touched on, the

24   Hepatitis C, it is a real issue for him, and that's

25   one of the reasons he wants to get out and get back on

1   track.  As partial justification, sure he should have
2   come back.  I think even if he had just left to use
3   drugs for eight months, you know, his guideline range
4   would still be the same.  He doesn't need a
5   justification for leaving for our arguments to go
6   forward.

7            But as for his guideline range, the
8   government writes for a couple pages about all these
9   charges and details of arrests from many years ago.
10  True, he is a Category V.  That's a very high
11  category.  That's how he even gets in this range where
12  he is pushed way up into Zone C it is.

13           Most people committing this offense would
14  be in a lower zone, which would be Zone B or even A.
15  So he does have that past, but it's quite a ways
16  behind him.  Except for this -- except for leaving the
17  halfway house, he's doing a wonderful job on release.

18           And he's got a plan.  He's got a plan for
19  when he gets out.  It's not many people who can say,
20  look, these two lawyers, they're ready to hire me.
21  It's a good job.  He wants to get at it.  He did a
22  little volunteer work for this Prison Legal News while
23  he was out before on his own volition, and we've
24  contacted them.  They'd be happy to have him back.  He
25  does a good job.

1               I submitted two samples, one was

2    miscopied, but he does good work for them and that

3    would be a great match for him in a way that he can

4    get back.  Of course, when he was brought here, we

5    filed a motion to plead guilty immediately.

6                    He's not trying to escape this charge or

7    get out of it somehow.  He's willing to face up to the

8    responsibility for it.  What we're asking for is not a

9    slap on the wrist, as the government calls it.  He's

10   really taking quite a bit of punishment for this.

11   He's already getting the six months for losing RDAP.

12                   For leaving the halfway house he's giving

13   up where he was, which is one month left in the

14   halfway house, for 12 more months is what he's asking

15   for.  And 12 months in a halfway house is quite a long

16   time, from what people tell me.  On top of that he'd

17   do the volunteer work.

18                   It's a significant penalty for a crime

19   that did not endanger people or cause harm to people

20   or threaten people.  I think it would be an

21   appropriate response to walk away, to extend his time

22   by basically 12, plus he's got that other RDAP time

23   served.

24                   THE COURT:  Okay, thank you.

25                   MR. HOLLEY:  That's our position,

1    Your Honor.  I know Mr. McWhorter wants to address you

2    too.

3                 THE COURT:  Okay.  Why don't I hear from

4    the government and then he can allocute.

5                 Ms. Daughtrey?

6                 MS. DAUGHTREY:  Your Honor, Mr. Holley

7    makes much of Mr. McWhorter already having received

8    punishment on -- for this offense, but, in fact, what

9    he's -- what's happening is he got a break on his

10   original felonies -- or federal sentence.  And so this

11   extra six months that he's getting is part of that

12   sentence, not -- not punishment for the escape per se.

13                Mr. Holley also makes much of the fact

14   that he only had one month left at the halfway house,

15   why would he run.  But the information that he

16   provides in his sentencing memorandum, looking at

17   Document 21-2 page 1, at the very top it shows that

18   this computation data was figured in August of this

19   year.

20                And, in fact, according to the PSR, at

21   the time that Mr. McWhorter fled from the halfway

22   house, he believed he was going to be there until

23   April of 2016.  So he did, in fact, have quite a bit

24   of time left there.  I don't understand the

25   calculations on how they do that and why it changed,

1    but I think that's sort of a hollow argument.

2              Mr. McWhorter apparently got out in June

3    of 2015 and it wasn't until the following March,

4    according to -- according to his sentencing memorandum

5    in which he sought treatment.

6              We've got something at Document No. 21-3

7    from this doctor, which I checked to make sure it was

8    legitimate, and there is a group by that name at that

9    location, but they note in that letter that he came to

10   them in March of 2016.  So he was out for quite a bit

11   of time before he sought the treatment.

12             And finally, I think one of the most

13   telling things about Mr. McWhorter and that I covered

14   quite a bit in my memo is not only does he have a

15   history of fraud, but it well appears that he has

16   continued with that fraud since he was released from

17   prison.

18             Mr. Holley read from the report that is

19   his Defense Exhibit No. 1.  I'm not sure where he says

20   that there were any other employees -- where he sees

21   there were any other employees from Strategic 1

22   Consulting.  Unfortunately, I don't have Chris Burt

23   here.  I proffer that he would tell you that in doing

24   this research, that receptionist was not a

25   receptionist solely for Strategic 1.  She had multiple

1    different little companies, one-room companies --

2                    THE COURT:  Kind of a suite.

3                    MS. DAUGHTREY:  A suite, exactly.  And

4    she represented to him that Mr. McWhorter was the only

5    person she knew that was connected to that -- to that

6    business that she had seen.  There's also information

7    that although he encouraged or hired people from the

8    halfway house, Diersen Charities, to work at that

9    company, my understanding is that nobody ever got

10   paid.

11                   I think Your Honor was very astute in

12   looking at the check and noticing that it's being

13   issued on November 23 of 2016, which is two and a half

14   months after he left the Diersen Charities and he's

15   trying to cash it two days later.

16                   I do think there may be some

17   misinformation about that company.  The impression

18   I've gotten all along -- and I wish again that I had

19   the agent here, but he's in Murfreesboro working on a

20   police shooting investigation and not able to come.  I

21   think that that organization was not -- or the company

22   was not a company that was created for the federal

23   charge before.  I think that's incorrect that's in

24   there.  Those -- those charges were based on other

25   fraudulent activity.

1          And then I completely lost my train of

2    thought, I'm sorry.  But I do -- oh.  So if you were

3    to excise that information out of the police report, I

4    still think these police reports still go to show that

5    there was very likely fraud going on.  Not only this

6    company that's based in Nashville where this check is

7    issuing on November 23, but the fact that they called

8    and nobody would ever answer, nobody would get back

9    with them.  They weren't ever able to recover it.

10          And even -- you know, here we are

11    almost -- or over a year later and they still haven't

12    recovered this money from this company, that this man

13    is pretty much the company.  Or perhaps his girlfriend

14    is.  It sounds like he wasn't allowed to work for

15    himself, so he may have put this company together and,

16    you know, had it in her name or something so that he

17    could say that he was working for a company.

18          But I think it's very clear that there

19    is -- that he's not been rehabilitated, that he really

20    is continuing to perpetrate fraud.  And while I could

21    have brought people down from Indiana, I chose not to

22    because of the time-consuming expense of doing that,

23    but I would ask Your Honor not to change the guideline

24    sentence.  I'm not asking -- or guideline calculation.

25    I'm not asking for that, but I am asking Your Honor to

1    take into consideration what was going on with that

2    here.

3           Mr. Holley also mentioned the debtor's

4    exam that was done this afternoon.  I was not present

5    for that, but my understanding -- and I believe

6    Mr. Holley was there the whole time -- is that at some

7    point fairly recently he received $64,000 from his

8    mother's life insurance while he was in prison.

9           Apparently he -- and these are his

10   representations at the time.  Apparently he used

11   $32,000 to pay off child support, which is very

12   commendable.  He then spent $11,000 in the prison

13   commissary.  When asked about why he didn't pay any

14   money toward restitution, he said he wasn't required

15   to do so until he was on supervised release.

16          He then said that he spent $7,000 on

17   attorney, $2,500 on an attorney and $2,000 on an

18   attorney.  And that he left prison with $4,200, which

19   he spent on clothes and phone when he was at the

20   halfway house.

21          So I think that goes a long way also in

22   sort of showing what his attitude is about this fraud

23   and making right and rehabilitating himself.  And that

24   is that he really doesn't have much drive to do that.

25          And I think another very telling point is

1    that my understanding from the investigator in

2    Maryland who did come down and speak with

3    Mr. McWhorter and Mr. McWhorter was willing to talk

4    with him, but my understanding from that detective --

5    and I'm sure Mr. Holley is aware of this -- is that

6    the detective thinks that this person who was murdered

7    was engaged in fraudulent activity at or around the

8    time of the murder.  So he was, if not involved

9    himself, hanging around with someone who was doing

10   something enough that he ended up getting murdered.

11           And, finally, it's interesting that even

12   if Mr. McWhorter fled the halfway house because he got

13   shot at and all we have is his -- you know, his

14   statement that that's the reason he left, which I

15   question, given his history of fraud, but even if that

16   is true, he didn't turn himself in, ever.

17           He was out until he was arrested eight

18   months later and I think that goes a long way also in

19   showing what his attitude is toward the criminal

20   justice system and what his responsibilities are.  So

21   I do think that the recommendation by the probation

22   office of 14 months is appropriate.  I think it's in

23   keeping with other types of cases that have been heard

24   in this district.

25           I did not do extensive research on them,

1    but I was able to discover that quite a few of those

2    sentences in that range were in your court, but also

3    with regard to the halfway house absconding, I think

4    it's probably pretty difficult to escape from prison

5    these days.  So most of those are pending sentencings

6    and coming out into the halfway house.

7             So I would ask Your Honor to impose the

8    guideline range.  I think it's appropriate in this

9    case given all of the factors here.

10            THE COURT:  Thank you, Ms. Daughtrey.

11            MR. HOLLEY:  Your Honor, may I respond?

12            THE COURT:  Okay.

13            MR. HOLLEY:  Your Honor, I believe the

14    rules of evidence and so forth at sentencing, there

15    are standards of evidence at sentencing, standards of

16    proof.  Ms. Daughtrey says that all we have is his

17    statement.

18             All we have from the government is an

19    agreement to what's in the presentence report and the

20    few words from the agent today, which said the

21    check -- the check was not paid.  It's still -- it's

22    still an outstanding balance.  He doesn't know why the

23    charge was, if it was insufficient funds or whether it

24    was a completely fraudulent check.  It doesn't appear

25    it was a completely fraudulent check.  It's from the

1 old company.  It goes back to all these addresses and

2 so forth.

3            The government's proof is just that,

4 well, the amount hasn't been paid back.  Maybe these

5 companies wrote it off long ago and didn't want to

6 lift another finger to try and --

7            THE COURT:  I don't really care about

8 that issue, Mr. Holley.

9            MR. HOLLEY:  Okay.

10            Your Honor, so Ms. Daughtrey says a lot

11 of things here without any support.  Even what she

12 says -- what Detective Matchett said.  I don't

13 remember Detective Matchett saying that.  I thought

14 that was why we agreed on a stipulation of what he

15 said.  Otherwise I was going to ask --

16            THE COURT:  What do you mean you agreed

17 on a stipulation of what he said?

18            MR. HOLLEY:  I'm sorry, Your Honor.  The

19 last page of the presentence report is an attachment.

20            THE COURT:  Oh, yes.

21            MR. HOLLEY:  That is what he -- that is

22 what we agreed upon, what Detective Matchett would

23 say.  I may just pause to let you read it.

24            THE COURT:  I read it, but let me scan it

25 again.  Let me scan it again.

1           (Pause in proceedings.)

2                THE COURT:  Okay.

3                MR. HOLLEY:  If Mr. McWhorter wanted to

4      go out and commit fraud, he would have picked up his

5      equipment from his lawyer a long time ago.  What --

6      what else.  It's this police report itself that

7      mentions other residents of the halfway house signed

8      up to work there, it says but they were never paid.

9                THE COURT:  Okay, I think I've really

10     heard enough, Mr. Holley.

11               MR. HOLLEY:  Okay.

12               THE COURT:  Unless you have something --

13     I'd like to hear from your client.

14               MR. HOLLEY:  Okay.  As I've said, it's

15     frustrating to see everything turned against him

16     when -- if Mr. McWhorter had reported the

17     misinformation that's in this report, they would be

18     saying it's part of a deliberate fraud and a scheme.

19     He cashed a check that bounced back.  That's all he

20     did.  That's all he did while on escape status.

21     That's all that's been proven.

22               THE COURT:  That's all we know he did on

23     escape status.

24               MR. HOLLEY:  Yes, Your Honor, it's true,

25     but the burden is on the government to prove things at

1  a sentencing.  And they're just trying to guess a lot

2  of things.

3              Mr. McWhorter.

4              THE DEFENDANT:  Good afternoon,

5  Your Honor.  First I want to say that I am truly very

6  sorry for leaving the halfway house.  You know, when I

7  left, everything that's in the PSI, all of that

8  happened.  I know that it's -- you know, it's just my

9  word to say it.  But in addition to me telling what

10  happened, you know, my best friend was murdered.  And

11  I think that Ms. Daughtrey kind of discounted that to

12  a very large degree.

13              THE COURT:  I didn't see any reference

14  anywhere to the fact that Mr. Nesbitt was your best

15  friend.

16              THE DEFENDANT:  It's all throughout

17  the -- in the PSI it was mentioned, in the --

18              THE COURT:  It mentioned he was a friend

19  or acquaintance.  Didn't say he was your best friend.

20  Tell me where it says best friend.  I think I would

21  have picked up on that.

22              MR. HOLLEY:  Your Honor, it says it in

23  something Mr. McWhorter filed or a statement.

24              MS. WINFREE:  It's paragraph 45,

25  Your Honor.

1          THE DEFENDANT:  He definitely was my best

2    friend.

3          THE COURT:  Okay.  Sorry.

4          THE DEFENDANT:  You know, the biggest

5    thing from what I've seen that you're concerned about

6    is that allegedly I waited a year to seek treatment

7    for the Hepatitis C.  That's absolutely not true.

8    When I was at the halfway house, I was -- I attempted

9    to apply for the Affordable Healthcare Act and was

10   told I was unable to because I was still in BOP

11   custody.

12          They referred me to Meharry Medical

13   Center.  And I -- I filed an affidavit in this case on

14   the bond motion where I detailed all this information.

15   I went to Meharry and Meharry told me that they don't

16   actually handle the Hepatitis C in that manner.  They

17   outsource to a local gastroenterologist.

18               When I called and spoke to them, the

19   cheapest one I could find was $1,500 up front at the

20   time, and I didn't have $1,500.  When I end -- when I

21   left the halfway house and got to Baltimore for that

22   month there, I did not seek treatment, I agree with

23   that.  As soon as I got to South Bend, I located a

24   Dr. VanderHeyden.  Incidentally I was -- my girlfriend

25   was going to the doctor because -- and that's when I

1    found Dr. VanderHeyden that he treated Hep C.

2              That was in December of 2015 that I

3    originally contacted his office and then they filed an

4    order for the blood work which was completed in

5    January of 2015.  I didn't get to see the doctor until

6    March of 2016, but the initial contact with the doctor

7    was in November and December of 2015.

8              After I had the blood work, their office

9    found a place called TLC pharmacy down in Louisiana

10   that referred me to the Gilead Support Path.  Filled

11   out all the paperwork for that and I got approved.

12   From the March date that I originally saw them, I

13   was -- I think I got approved in April, and the

14   earliest that they could get the pills to me would

15   have been June 16.

16             And, of course, May 27 I was arrested.

17   So I was unable to take the pills on June 27 -- or

18   June 16.  I requested treatment at -- almost on a

19   monthly basis when I was in the BOP.  I'm in a

20   constant low-level pain now from my liver.  My viral

21   load is astronomically high at this point.  25 million

22   is supposed to be associated with jaundice.  And

23   remember that the 7 -- or 19.7 million was almost a

24   year ago now that it was tested, and it's

25   progressively getting worse.  I can actually run my

1    hand down my body and feel my liver now, and that's

2    not natural at all.

3              The BOP won't treat it.  The local jails

4    won't treat it mainly because it's an $85,000 program.

5    But I tried literally from the very first week that I

6    was out to try and get this treatment.  I had asked

7    for it continuously when I was in prison.  I even told

8    them that if I don't get it while I'm in prison I'm

9    going to get it when I get out.

10             In one of the documents that Mr. Holley

11   filed, it stated in there that I only had 14 months

12   left at the time and that it wouldn't be enough time

13   to be able to get the treatment.  And if I'm given the

14   sentence that Ms. Daughtrey is requesting, I won't be

15   able to get the treatment.

16             It's another 14 -- actually, it will

17   another two and a half years of liver damage that it's

18   constantly -- at this point with my ALT and ASO -- AST

19   scores, I'm at compensated cirrhosis.

20             Because my liver's swollen, it is

21   considered cirrhosis, but my body's still compensating

22   for the damage that the hepatitis is causing.  When it

23   goes into decompensation, nobody can say.  I know

24   Mr. Holley spoke with several different experts when

25   we were preparing for this in the beginning, and

1    nobody can say what's going to progress fast, what's

2    going to progress slow, nobody knows.

3              Currently my viral load has been

4    progressive since the first time I found it is at an

5    average rate of about 4.5 million per year.  If that

6    continues to be the case -- and I don't know because I

7    haven't been tested in over a year on it, but if that

8    continues to be the case, I'm almost to that point

9    that it's going to be decompensated cirrhosis, which

10   can turn into liver cancer, many other things.

11             And it's -- I completely understand that

12   what I did was wrong.  I know that in hindsight I

13   should have immediately called the police.  I think my

14   biggest fear was that I would be immediately taken

15   back into custody, even though I'd done nothing wrong.

16   They couldn't have left me at the halfway house

17   knowing that something happened.  They would have

18   taken me back in.

19             I'd just got through serving nine

20   calendar years and then to get taken back into custody

21   for something that I had no control over and I just --

22   I panicked.  I mean, you know, there's -- there's --

23   there's no way to describe how that felt.  I'd never

24   been shot at.  I'd never been involved in anything

25   even close to something like that.  And, you know,

1    when we -- circumstantially, I left all my property

2    at -- all my clothes, you know, everything that I

3    owned with the exception of the clothes I was wearing

4    on my back at the halfway house, all that equipment

5    that was at Chip Frensley's office.

6              If I was just going to commit crimes --

7    you know, Ms. Daughtrey said it's a 10-year-old

8    printer, but that printer worked.  That printer worked

9    just fine 10 years ago, and it could have done

10   everything that I did before.  If that's all I wanted

11   to do, I could have grabbed it and went.

12             I wouldn't have left anything at the

13   halfway house because I could have took it.  It's one

14   of those things that if I was planning on running, if

15   this was something that was really orchestrated that

16   I'm going to do this and I'm just a bad guy, I

17   wouldn't have had to leave anything.  I wouldn't have

18   had to take off.

19             It wouldn't have been just a snap

20   decision and I'm done.  If I just wanted to leave the

21   halfway house, all I had to do was ask for a haircut

22   pass and I could leave.  Nobody's going to question

23   you, nobody's going to ask what are you doing or

24   anything, you just go.  And if you don't want to come

25   back, you don't come back.  That's, I guess, the trust

1    that's given to you at the halfway house.

2                    So to me when, you know, people talk

3    about the company was fake or this or that, it's --

4    it -- I almost want to say slightly insulting.  And I

5    understand that because of my past everybody thinks

6    that I'm just trying to do bad things, but this was a

7    legit company.  I was doing legitimate paralegal work.

8                    Me and now Judge Frensley had just signed

9    up a 2255 -- or a 2241 case that I started in prison.

10   We signed up, we got everything, you know, all the --

11   the contracts signed with the client.  And

12   Mr. Frensley and I signed contracts between, you know,

13   his company and Strategic 1, what it would get paid,

14   how much work I would be doing, so on and so forth.

15                   This was legit.  I worked for

16   Mr. Frensley, Casey Long out of the Franklin.

17   Tennyson Wiggington, those were the biggest ones.  And

18   my work was good enough with them that they want to

19   hire me now.  When I got arrested, you know, I knew

20   that I couldn't -- I didn't want to get out and wing

21   it; whereas, last time when I got out, I just kind of,

22   you know, was just going with it as it was coming to

23   me.  And this time I want to make sure that I have a

24   very solid plan.  So I made sure that I got a job.

25                   I know that the Gilead Support Path is

1    still available where I can get it.  The 12 months in
2    the halfway house gives me enough time to where I can
3    save up and be able to get my own place because I
4    don't have anybody left.
5              THE COURT:  Why can't you get these drugs
6    when you're in the Bureau of Prisons?
7              THE DEFENDANT:  They just won't give it
8    to me.  I wish that we could say why.  But if you look
9    at the medical records that we've submitted, I've been
10   asking since late 2010, early 2011 and they just won't
11   do it.  You know, it's either we don't have a
12   full-time doctor or we're going to refer you for
13   treatment or you just don't have enough time left.
14             If I'm given the 14-month sentence that
15   is requested, they've already -- in the paperwork from
16   Dr. Ash -- when I was at FCC Tucson, she explicitly
17   says, there's only 14 months left, you probably don't
18   have enough time for the screening.
19             The way the process works there, they've
20   got to take all your blood work, they blood work --
21   I'm sorry, when I get excited, I talk fast, I
22   apologize.  The BOP had said that they have --
23   pursuant to their policy, they have to take recent
24   blood work within 90 days.  And then after that it has
25   to be submitted to a committee which takes anywhere

1 between 90 days to 180 days in order to approve
2 because of the cost of the medication.
3           I believe Mr. Holley says it's 85,000. I
4 had thought it was 65,000, but, you know, he got that
5 number from somewhere reliable, I'm sure. They just
6 don't want to do it. I mean, it's such an expensive
7 medication that they just don't want to do it.
8           And no matter how much I asked, it was
9 no, no, no, no, we're just not going to do it. And if
10 I'm sentenced to prison now, they're still not going
11 to do it. But the Gilead Support Path program, we
12 know it's available. We know that I can get it. I've
13 already been approved, and we know that I can get the
14 treatment.
15           It's a three-month course of treatment
16 and there's a -- I think a 99.8 percent cure rate of
17 it. I never have to worry about anything turning into
18 cancer or dying from it, anything. It's cured. And
19 it was my fault that I contracted Hepatitis C. I was
20 using intervenous drugs. I shouldn't have been. But
21 I've been clean for 10 years. And that's -- that's --
22 I'm extremely proud of that. 10 years from heroin
23 addiction is almost impossible most times. I haven't
24 relapsed in the slightest bit.
25           You know, it's -- I don't know what else

1  I can do to show that I've changed.  You know, I -- I
2  got a plan together.  I got volunteer work done that
3  I'd previously done before.  I got a job, I got
4  everything that I could do to say I'm not just
5  free-wheeling it, here's what I want to do.
6          The five years probation, that's more
7  time than I could get under the guideline sentence.
8  That would only be three years supervised release, so
9  that gives me an additional two years to try and get
10  the restitution paid off.  I wasn't trying to hide
11  anything.
12         And, you know, the 11,000 on commissary
13  was over a three-year period.  And it wasn't me who
14  thought that it didn't apply.  I was told by the BOP
15  that the 10 percent that I'm supposed to pay --
16  because I genuinely attempted to pay the 10 percent to
17  the BOP under the Financial Responsibility Program,
18  which is what the Court ordered me to do when I was
19  sentenced.
20         When I attempted to pay it, they said you
21  don't have to pay 10 percent of what you receive until
22  you're on supervised release.  If you look at the
23  judgment, it could reasonably be construed that way.
24         THE COURT:  Well, judgments usually say
25  that your repayment will begin under the Inmate

1  Financial Responsibility Program.

2          THE DEFENDANT:  Which was 10 percent of
3  what I was trying to get in.  At the time the contract
4  that I'd signed was for $25 a quarter, but I genuinely
5  attempted to pay that.  The money that I got on the
6  restitution (sic), I paid off my past child support.
7  The attorney that I hired, you know, was for the RDAP
8  time.

9          I had a detainer pop up from 2006 from
10 the original federal case, and they just -- they
11 wouldn't dismiss it, but I hired an attorney, took
12 care of it.  Mr. Frensley for various things that he
13 did for me, he charged me about $7,000 in fees.  And
14 then he was paid another $2,000 to attempt to take
15 care of the warrant, but he -- for one reason or
16 another, couldn't get it taken care of.

17         THE COURT:  All right.  You can sit down.
18 Unless you have something else you want to say.

19         THE DEFENDANT:  That's it.

20         THE COURT:  All right.  Ms. Daughtrey,
21 did you have something you wanted to say?

22         MS. DAUGHTREY:  Your Honor, I'm
23 empathetic with Mr. McWhorter having Hepatitis C and
24 wanting to treat it, but I think it's very interesting
25 that he is representing how desperate he is to treat

 1    the Hepatitis C, and yet he had $64,000 and not a
 2    penny of that went to medical treatment.  And he's got
 3    this spend thrift trust, which it seems to me that
 4    would cover medical expenses.  So I'm a little puzzled
 5    by those inconsistencies.  I just wanted to point that
 6    out.
 7                THE COURT:  I need some more information,
 8    and that is, with the workup that he's already had,
 9    the medical records that he already has, if I
10    recommended that he be sent to a medical facility, a
11    BOP medical facility, for Hepatitis C treatment, I
12    want to know what the BOP would say about that.
13                So I need that information before I'm
14    prepared to sentence him.  And Ms. Winfree, can you
15    get that information or who should I tax -- task with
16    that information?
17                MS. WINFREE:  Your Honor, you may task
18    me.
19                THE COURT:  I will task you.
20                MS. WINFREE:  I will do my best to get
21    that information.
22                THE COURT:  Can you get my calendars,
23    Ms. Beasley, for next week?
24                MS. WINFREE:  I suspect they will have to
25    send his information off to determine which level of

medical care he qualifies for, but Your Honor is
saying if you put in the recommendation explicitly for
medical facility for treatment of hepatitis, what
would they do?

            THE COURT:  What would they do.  And that
is because -- I mean, we have filed in the record of
the case, I believe, certain medical records.  Do we
have the medical records from the person up in
Indiana?  Mr. Holley, do you have the medical records
from the person in Indiana?

            MR. HOLLEY:  Your Honor, I have -- I do
have some.  I gave them to Ms. Winfree.  I'm not sure
if I --

            MS. WINFREE:  I have them in my
possession.

            MR. HOLLEY:  Your Honor, I did cite in my
memo the BOP's resource on evaluation and management
of chronic Hepatitis C.

            THE COURT:  What page of what memo?

            MR. HOLLEY:  This is the bottom of
page 7, Your Honor.

            THE COURT:  Is this your first memo?

            MR. HOLLEY:  Yes, Your Honor.  I guess
I'm not an expert, but reading that -- that program
statement of theirs, it describes how severe the

1    Hepatitis C has to be.  I think you have to have

2    cirrhosis, you have to have liver cancer, basically,

3    to get treatment.  There are so many -- from reading

4    online, I've read prisons in general, state prisons,

5    federal prisons --

6            THE COURT:  Everybody's struggling with

7    it.

8            MR. HOLLEY:  So many people have Hep C

9    that if they paid $85,000 for each person, there would

10    be no money left for the State to build roads or

11    anything.  His medical records that we submitted says,

12    has 14 months left.

13            THE COURT:  Says what?

14            MR. HOLLEY:  Inmate wants treatment.  Has

15    14 months left on sentence.  We'll notify IDC in case

16    there is time.  And then he didn't get the treatment.

17    This was submitted in our sealed document.

18            I mean, I guess I can't testify as an

19    expert about the BOP, but everything I read makes the

20    chance virtually nil that he is going to get treatment

21    from the BOP.  They are not going to spend 85,000

22    extra dollars on Mr. McWhorter.

23            THE COURT:  Is this the only treatment

24    for Hepatitis C is $84,000 in drugs?

25            THE DEFENDANT:  There's two.  Your Honor,

1   there's two.  There's —— you have the interferon

2   treatment, which is injections, and the cost of that

3   medication is probably around 30 to $45,000.  They

4   don't like to do that anymore because it's —— instead

5   of having a three-month treatment where with the

6   SOVALDI it's an six-month treatment and the inmate at

7   the time essentially has the flu for six months.

8           You know that achy feeling that you get

9   in your body when you get the flu, that's interferon,

10  and it —— apparently they found that it fights off the

11  Hepatitis C virus.  Well, they constantly inject it

12  into you on a daily basis throughout that six-month

13  period coupled with the ribavirin, the same thing that

14  they use with the SOVALDI, the 1500 milligrams of

15  ribavirin, and then the Pegon interferon.

16          They consider that treatment almost

17  archaic at this point because it's so taxing on the

18  person's body that they go to the SOVALDI.  The

19  guidelines that —— or the BOP policy that Mr. Holley

20  was speaking about, they talk about this SOVALDI and

21  how it's supposed to apply.  If you —— if you have to

22  take off all the time remaining on the sentence or the

23  halfway house, when you do that, there's not enough

24  time left for them to give you the treatment based

25  upon the way the committee approves the pills.

1          You'd have to sentence me to almost four

2     years in order for me to get the treatment in the BOP,

3     even at a medical center, because the Tucson was a

4     Care Level III facility that I was at and that's

5     considered a medical center for patients with cancer

6     and things of that nature, but until you're to the

7     point that you're jaundiced and about to die, they're

8     just not going to give it to you.  Like you said, it

9     just costs entirely too much money and it's the BOP.

10    They don't like to spend money.

11          THE COURT:  Well, I'd like to have the

12    information anyway.  You think you can have this by

13    Wednesday, Ms. Winfree?

14          MS. WINFREE:  Next Wednesday, Your Honor?

15          THE COURT:  Uh-huh (affirmative).

16          MS. WINFREE:  I don't think that should

17    be a problem.

18          THE COURT:  Or Thursday.  Ms. Daughtrey,

19    are you still around on Wednesday and Thursday?

20          MS. DAUGHTREY:  Your Honor, I'm not sure

21    if I will be or not.

22          THE COURT:  When are you -- I know you

23    were going on a trip.

24          MS. DAUGHTREY:  I'm scheduled to leave

25    Tuesday afternoon, but I can get somebody to cover if

1    you want to set it still this year.

2           I'm almost wondering if having them look

3    at the records that Mr. Holley has from Indiana might

4    not help them to make that decision because those are

5    more up to date than the information that we have

6    from -- and my understanding, it was about 500 pages.

7    I never saw it, but that's what Mr. Holley represented

8    to me.  But that's, you know, over a year and a half

9    old at this point.

10           THE COURT:  From Indiana?

11           MS. DAUGHTREY:  No, from when he was at

12    the BOP previously.

13           THE COURT:  500 pages of BOP records.

14           MR. HOLLEY:  There's 500 pages from the

15    BOP, Your Honor.  There's only about five pages from

16    Michiana.  You know, a few.  It's only a couple pages

17    of tests, really.

18           THE COURT:  Yeah.  Well, but they could

19    see how it's developed if they see the Bureau of

20    Prisons records.

21           MR. HOLLEY:  I understand that you'd like

22    an official answer, Your Honor.  I suspect that

23    they're going to need to do more tests before they

24    decide where he is at this moment.

25           THE COURT:  And they probably won't rely

1  on some other doctor's records, even if they're more

2  up to date than the BOP.

3             I'm going to take a short recess.  I'll

4  be back.

5             (Whereupon, a break was taken from

6  4:43 p.m. to 4:51 p.m.)

7             THE COURT:  All right.  I'm going to

8  proceed with the sentencing.  I don't -- I'm

9  pessimistic, as are all of you, that we will --

10  certainly won't get any commitment from the Bureau of

11  Prisons and we might not even be able to get any

12  reliable information.

13             The Court's obligation is to impose a

14  sentence that is sufficient but not greater than

15  necessary to comply with the purposes of the

16  sentencing statute, taking into account the nature and

17  circumstances of the offense and the history and

18  characteristics of the defendant.

19             Mr. McWhorter has pled guilty to escaping

20  from a halfway house in September of 2015, September 7

21  of 2015.  He was placed there in June of 2015,

22  apparently did well there, had a job, and left after

23  he and his best friend were shot at, apparently, in

24  Nashville.

25             He says he panicked and they ran and they

1  went to Baltimore.  And a month later his friend,

2  Mr. Nesbitt, was murdered in Baltimore and

3  Mr. McWhorter then went to Indiana, and apparently has

4  been living with a girlfriend in Indiana since then

5  and was arrested on May 25 of 2016.

6           This is obviously not the most serious

7  offense that comes before the Court, and even with a

8  Criminal History Category V, Mr. McWhorter's guideline

9  range is 12 to 18 months.  But it does reflect a

10 disrespect and a lack of trust in the judicial system,

11 I guess, but mostly it reflects bad judgment and

12 disrespect of the judicial system.

13          Mr. McWhorter's explanation for why he

14 ran holds not very much water with the Court.  On the

15 one hand he's telling us that he is just almost a

16 lawyer.  He's writing briefs and working for lawyers

17 in Nashville and being paid for that work.

18          And then on the other hand he somehow

19 concluded that because he had been shot at -- he

20 didn't do any shooting, he didn't have a gun, that

21 because he had been shot at, somehow he would be taken

22 back into custody and wouldn't be able to stay at the

23 halfway house.

24          So that explanation makes little sense,

25 and it makes the Court suspect that there was

1    something more going on than Mr. McWhorter simply

2    being innocently shot at.  At any rate, that would be

3    speculation on my part.

4                At any rate, he panicked, as he said,

5    because he was afraid he would be taken back into

6    custody, and he fled to Baltimore.  Well, he was in

7    Baltimore for an entire month.  I'm sure he wasn't in

8    the state of panic for an entire month.

9                He could have come to his senses and

10   realized if he were not involved in something in

11   Baltimore with his best friend, could have realized

12   that he made a big mistake, called his probation

13   officer, explained this innocent explanation that he

14   was simply shot at and did nothing wrong.  But he

15   didn't do that.

16               And then after his friend was murdered,

17   then he fled to Indiana, where he was arrested many

18   months later cashing a check that was drawn on the

19   company that apparently, according to his own

20   admissions here, his lawyer's admissions, statements,

21   he had friends of his -- I'm wondering if this Alex

22   Friedmann -- the Court's very familiar with

23   Mr. Friedmann.  Did Mr. Friedmann set up this company

24   for him?

25               MR. HOLLEY:  No, Your Honor.

1          THE COURT:  All right.  Some other

2    friends set up the company for him, so that the

3    lawyers could pay this company for paralegal services

4    because he was not allowed to function as an

5    independent contractor while at the halfway house.

6          I also have some -- a lot of skepticism

7    about this little arrangement.  I can't believe that

8    principal defense lawyers like Mr. Frensley would

9    engage in a scheme with Mr. McWhorter that

10   circumvented the rules of the halfway house, because

11   he was, in fact, functioning as an independent

12   contractor through a shell company that issued the

13   checks for his work.  I find myself very skeptical of

14   all of this.

15         Not that he didn't do work for Chip

16   Frensley and other lawyers in town; I suspect that he

17   did.  But whether they had any notion of what he was

18   doing and that he was violating the rules of the

19   halfway house by setting up a shell corporation, I

20   doubt it.

21         So he is caught and arrested in Indiana

22   when he tries to cash a check that is, what, six

23   months old on this shell corporation.  And I'm not

24   supposed to think that this is not a fraudulent act?

25   I'm sorry, Mr. Holley, this was a fraudulent act.

1    This was an old check issued on a company

2 that I suspect wasn't even in existence because it

3 apparently was only in existence to pay Mr. McWhorter,

4 but it was issued six months ago.  He just needed

5 money.  And he either created the check or he found

6 the check that he had not cashed, which might or might

7 not have been legitimate in the first place.

8    At any rate, I'm not finding it was a --

9 I'm not finding it was a crime, but it's very shady,

10 let me put it that way, especially given

11 Mr. McWhorter's record of past identity theft,

12 creating false driver's licenses, paper hanging.  Very

13 hard to describe somebody as a paper hanger, but I

14 think that applies to Mr. McWhorter over the course of

15 his career.

16    So it's very hard to believe that there

17 was anything legitimate about the cashing of this

18 check.  I think he knew there was no money in the

19 account for that company at the time that he cashed

20 this check.

21    At any rate, so he's arrested and he's

22 brought back.  I myself -- Ms. Daughtrey researched to

23 make sure that this doctor and his clinic was

24 legitimate.  I myself had someone in my office do

25 research to make sure that these two Nashville lawyers

1    who supposedly are ready to hire him were legitimate,

2    because I've never heard of either of them and they're

3    not in the bar directory.

4              They both went to UT.  They are

5    legitimate lawyers.  I have no idea what they

6    practice, but they're legitimate, so he has a

7    legitimate job offer and good for him, and I hope he

8    can get that.

9              In terms of the health issues, I am

10   sensitive to them.  I'm sympathetic to them, but as

11   Mr. McWhorter admitted to the Court and as we all

12   know, this is not a case where Mr. McWhorter

13   contracted Hepatitis C in jail by being infected with

14   it because of contagion in a jail.  He has Hepatitis C

15   because he was an intravenous drug user.  So this

16   condition was brought upon by his own actions.

17             There is an epidemic of Hepatitis C in

18   the prison systems as we speak.  It's on the front

19   page of the paper within the last two weeks what

20   Tennessee's going to do about the epidemic of

21   Hepatitis C in the State institutions.

22             And I'm not sure what anybody's going to

23   do about it, but I cannot let his medical condition

24   that he brought on himself through illegal behavior

25   trump everything else in this case.  And we will just

1  hope that Mr. McWhorter can get the necessary

2  treatment in time for him not to develop cirrhosis or

3  cancer of the liver.

4           I have no proof that Mr. McWhorter is in

5  the dire state that he tells me that he can run his

6  hand down his side and feel his liver.  I hope that

7  that's not true.  And I hope that it's not such a

8  fast-growing condition that it cannot be halted at

9  some point.

10          He certainly apparently at some point is

11  going to have some good resources to use to get the

12  drugs that he is going to find necessary.

13          In terms of his history and

14  characteristics, Mr. McWhorter is 37.  He has a GED

15  and apparently has some college work.  He at the young

16  age of 22 received a four-year sentence for forgery;

17  his 2009 federal conviction where he used counterfeit

18  driver's licenses to cash counterfeit payroll checks

19  to the tune of $250,000.

20          Lots of fraudulent check charges in State

21  court were dismissed because of the federal charges

22  pending, and he certainly got a stiff sentence for

23  those federal charges.  But he has quite a history of

24  fraudulent acts.

25          His parents, I guess, were both

1    alcoholics.  His mother worked for the Department of
2    Defense, his father was a real estate agent.  They
3    were divorced when he was three.  He has had one
4    sibling who died in custody in 2011 at the age of 35.
5              Claims his mother physically abused him
6    as a child.  He has been married three times.  His
7    second wife was a codefendant in the federal case.
8    He's got two children, 19 and 18.
9              I'm glad that he has the job skills that
10   he has.  I'm glad he has a job offer which I'm sure
11   will be available to him when he finishes this
12   sentence, but I simply cannot give the sentence
13   requested by the probation -- by the defense and give
14   him five years of probation for escaping from the
15   halfway house for reasons that make no sense and hold
16   no water with the Court.
17             So for all these reasons, I'm going to
18   give him a slight variance because of his medical
19   condition and I'm going to sentence him to eight
20   months in custody, to be followed by three years of
21   supervised release.
22             I don't levy a fine because I want him to
23   pay the restitution he owes in the other case, and I
24   feel that he could not pay both.  No restitution is
25   due in this case.  He must pay the $100 special

1    assessment.

2              I feel that this sentence will reflect

3    the seriousness of the offense, promote respect for

4    the law, be a just punishment, protect the public from

5    further crimes of the defendant, and will avoid

6    unwarranted sentencing disparities among defendants

7    who have committed this crime in this district.

8              The special conditions of his supervised

9    release are drug testing and substance abuse treatment

10   and pay for it if he has financial resources.  Mental

11   health program if determined advisable by the

12   probation office.  He's to furnish all financial

13   records and tax returns.  He's prohibited from owning,

14   carrying or possessing firearms, destructive devices

15   or other dangerous weapons.  And he's to cooperate in

16   the collection of DNA.

17             I will recommend that he be placed in a

18   medical -- BOP medical facility and that he

19   immediately receive treatment for Hepatitis C.

20             Are there any other recommendations you'd

21   like me to make?

22             MR. HOLLEY:  No, Your Honor.

23             THE COURT:  And this eight months will be

24   consecutive to whatever's left on his other sentence.

25   Does anyone have objections to my sentence that have

1    not previously been raised?

2              MS. DAUGHTREY:  No, Your Honor.

3              MR. HOLLEY:  No, Your Honor.

4              THE COURT:  Ms. Daughtrey, do you object

5    to my variance?

6              MS. DAUGHTREY:  No, I do not, Your Honor.

7              THE COURT:  There was no plea agreement

8    in this case.  I want to inform Mr. McWhorter that he

9    has a right to appeal his sentence.  Any appeal must

10   be filed within 14 days.  You may apply to appeal

11   under the pauper's oath and the clerk will file your

12   notice of appeal if you request the clerk to do so.

13             I want to compliment Mr. Holley who

14   always does an excellent job on his cases, but he went

15   above and beyond.  And you almost convinced me, but

16   you didn't.  But you did an excellent job, and I hope

17   your client appreciates your hard work.  We're in

18   recess.

19             (Which were all of the proceedings had in

20   the above-captioned cause on the above-captioned

21   date.)

22

23

24

25

1    **REPORTER'S CERTIFICATE PAGE**
2

3         I, Roxann Harkins, Official Court Reporter

4    for the United States District Court for the Middle

5    District of Tennessee, in Nashville, do hereby

6    certify:

7         That I reported on the stenographic machine

8    the proceedings held in open court on December 16,

9    2016, in the matter of UNITED STATES OF AMERICA v.

10   JAMES C. McWHORTER, Case No. 3:16-00162; that said

11   proceedings were reduced to typewritten form by me;

12   and that the foregoing transcript is a true and

13   accurate transcript of said proceedings.

14

15         This is the 7th day of June, 2017.

16

17                    s/ Roxann Harkins_____
                      ROXANN HARKINS, RPR, CRR
18                    Official Court Reporter

19

20

21

22

23

24

25